# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| WENDY KINCHEN, individually and as personal representative of SHELLIE LEE KINCHEN WOOD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| GATEWAY COMMUNITY SERVICE BOARD; GLYNN-BRUNSWICK MEMORIAL HOSPITAL AUTHORITY, d/b/a CAMDEN MEDICAL CENTER; JARRETT B. BOLIN; and MARGARET HURLEY, | : | |
| Defendants. | : | NO. CV205-115 |

## O R D E R

Plaintiff, Wendy Kinchen ("Kinchen"), brought suit against Defendants, Gateway Community Service Board ("Gateway"), Glynn-Brunswick Memorial Hospital Authority, doing business as Camden Medical Center ("Camden Medical Center" or "CMC"), Jarrett B. Bolin, and Margaret Hurley, alleging negligence in the treatment of the deceased, her daughter, Shellie Lee Kinchen Wood ("Wood").

AO 72A
(Rev. 8/82)

The case is before the Court on Defendants' motions for summary judgment.   Because there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law, the motions will be **GRANTED**.

## BACKGROUND

In early May 2002, Shellie Wood was living with her boyfriend, Robert Sovilla, at his residence in Kingsland, Georgia.   During the evening of May 9, 2002, Wood accused Sovilla, a Camden County Deputy Sheriff, of having an affair with an ex-girlfriend, who was one of his co-workers.   An argument ensued, and Wood's friend and co-worker, Carla Anderson, was called to come pick up Wood.   According to Sovilla, he did not want Wood to leave on her own because she had been drinking.   Dkt. No. 44, Tab 4, Georgia Bureau of Investigation ("GBI") Agent James Turner-Sovilla Interview, June 15, 2002, at 3-4.

Because Anderson was having car trouble that evening, her roommate dropped her off at Sovilla's residence.   When Anderson arrived, Wood was distressed and upset as a result of the quarrel.   The women left in Wood's car, with Anderson driving. While the two headed to Anderson's home in Woodbine, Georgia,

2

Wood told Anderson repeatedly that she wanted to return to Sovilla's house, but Anderson refused to turn around. Nevertheless, when Anderson stopped at a convenience store on the way home, Wood changed seats and drove away, leaving Anderson behind. While Anderson began the two hour walk toward her residence, Wood drove back to Sovilla's home.

Shortly thereafter, Sovilla contends that he heard a sound like a gunshot outside of his house, and he went to the door to investigate. Sovilla was met at the door by Wood, who had his .25 caliber pistol in her hand. Sovilla stated that Wood then placed the gun in her mouth and pulled the trigger, but the gun misfired. Dkt. No. 44, Tab 4, Turner-Sovilla Interview, June 15, 2002, at 4. After Sovilla took the weapon away from Wood, Wood grabbed a knife from the kitchen in an attempt to harm herself.

Thereafter, Sovilla pinned Wood to the ground and called 911, informing the dispatcher that Wood had attempted suicide. A Kingsland police officer, John Fear, arrived on the scene, along with his supervisor, Sergeant Nobles. Fear recognized Sovilla as a Deputy Sheriff, and separated the two when Wood told the officer that Sovilla was hurting her arms. Sovilla told Fear that the gun had misfired when Wood tried to shoot

AO 72A
(Rev. 8/82)

herself, and also related that Wood had tried to harm herself with a knife.

To the contrary, Wood denied any suicide attempt, and reported that she had confronted Sovilla about an affair that he was having with an ex-girlfriend, who was now married. According to Wood's statements at the scene, after Wood threatened to tell the woman's husband about the adultery, Sovilla pinned her down, and concocted the entire suicide story.  Wood stated that Sovilla believed he had the power to do this because of his position in law enforcement.

Due to the dispute regarding the state of Wood's mental health, Fear took Wood to Camden Medical Center to be evaluated.   Meanwhile, Sergeant Nobles took custody of Sovilla's Raven Arms .25-caliber semiautomatic pistol, and placed it into evidence.  Dkt. No. 44, Tab 4, Kingsland Police Dep't Incident Report (Addendum to Turner-Fear Interview of May, 30, 2002).

Upon Wood's arrival at the hospital, Nurse Margaret Hurley performed a triage to assess the urgency of Wood's medical condition.   Hurley noted Wood's chief complaint, self-harm (which actually was not Wood's complaint, because she again denied any suicidal behavior); took her vital signs; made a

4

physical assessment; and noted Wood's allergies and medications.

Dr. Hal London, an employee of First Coast Emergency Services and an independent contractor at CMC, ordered Wood to be evaluated by a licensed mental health provider. Jarrett Bolin, a licensed counselor employed by Gateway, was summoned for the task at around 1:00 AM on the morning of May 10, 2002. Bolin was asleep at his home at this time, but was on call if needed in such a circumstance. Bolin arrived for the evaluation at about 2:00 AM, and spoke with Wood for an hour. Bolin completed a worksheet that identified Wood's biographical information and psycho-social history, and performed a diagnostic "Locus Assessment" on Wood, which purported to show whether her mood was controlled by internal or external factors.

During Wood's conversation with Bolin, she remained steadfast in denying any thoughts of suicide. Bolin reported that Wood's "risk of harm" was "low," a two on a scale of one to five. Bolin judged Wood's functional status to be low as well. Dkt. No. 36, Ex. G at 1. According to Bolin, that meant that Wood "was tired, calm. She wasn't involved in a lot of higher level processing. She wasn't broad effectively." Bolin

5

Dep. 67. Bolin wrote that Wood appeared disheveled, depressed (which he noted was "due to breakup"), and sad, but also reported that she seemed calm, fully oriented, cooperative, and that she had good impulse control.

Wood's CMC medical records demonstrate that she had been diagnosed with bipolar disorder, a psychological condition characterized by periods of mania and depression. Wood's records also show that she had been prescribed several pharmaceutical drugs, including Trazodone, a mood-stabilizing antidepressant; Xanax, a psychotropic medication prescribed for anxiety disorder or panic attacks; Ativan, a medication used to treat Wood's bipolar disorder; Temazepam, for insomnia; and Neurontin, another mood-regulating drug. Dkt. No. 33, Ex. C. at 5; Bolin Dep. 28-29, 52.

Bolin concluded that Wood was unlikely to commit suicide and recommended that she not be kept under observation at the hospital against her will. Instead, Bolin recommended that Wood meet with her psychiatrist soon,[1] and told her that she could stop by his office to talk to him during business hours later that day. Based on Bolin's advice, Dr. London ordered

---

[1] When Wood was released from CMC, she was under the care of a psychiatrist in St. Marys, Georgia, or Jacksonville, Florida.

AO 72A
(Rev. 8/82)

that Wood be released from the hospital's care.   Hospital personnel called Anderson to take Wood home, and Wood spent the night at her friend's residence.

Although Anderson thought that Wood seemed depressed when Wood awoke later that morning, Wood told Anderson that she wanted to get on with her life.  Wood left Anderson's home that day to go to the residence of another co-worker and friend in Woodbine, Anitra Lynn, for whom Wood was supposed to house-sit. According to Anderson, the following morning, May 11, 2002, Wood was back to normal, not depressed, and stated that she no longer wanted Sovilla in her life.

Sovilla related that Wood's state of mind on May 11, 2002, was quite different than was described by Anderson.   Sovilla stated that Wood had called him that day and intimated to him that she was preparing to end her life.  Purportedly, Wood told Sovilla that he and Anderson were to get $5,000 and $1,000 of her savings, respectively, because "she did not need money where she was going."   Dkt. No. 44, Tab 4, Turner-Sovilla Interview, June 15, 2002, at 8.  Wood explained to Sovilla that she did not want her mother to have this money because Wood was convinced that Kinchen did not love her.

AO 72A
(Rev. 8/82)

Sovilla reported that he heard Wood fire a test shot while he was on the phone with her, and that she remarked that this gun was louder than Sovilla's firearm.    Despite Sovilla's entreaties, Wood insisted that she wanted to die, and hung up on him.  Dkt. No. 44, Tab 4, Turner-Sovilla Interview, June 15, 2002, at 9.    Sovilla called 911 and stated that Wood was preparing to kill herself, or had already done so.    Sovilla knew that Wood was at Lynn's residence, but did not know where the house was located in Woodbine.    Sovilla did know Lynn's phone number, and he asked the dispatcher to give him the address based on this information.  The dispatcher refused, but did take the phone number down so that the lawful authority could respond and investigate.

Woodbine Police Officer Debby Vitale was dispatched to the scene.    Meanwhile, Sovilla was driving from Kingsland to Woodbine when he saw a coworker from the Sheriff's office, Sergeant Bartamus, pass him.  Sovilla followed Bartamus to the area near Lynn's home, and was able to direct Vitale into the correct house, once he recognized Wood's automobile.    Vitale found Wood dead in Lynn's bathroom from a gunshot wound to the head.    Coroner L. W. Bruce determined that the death was suicide, and no autopsy was conducted.

8

At the time of her death, Wood was thirty-seven years old. Wood had been a pharmacist, but she lost her license due to substance abuse. When she died, Wood was working at the Cracker Barrel in Kingsland. During the four years prior to her death, Wood had attempted suicide by overdosing on pills on at least five different occasions, and was accepted for inpatient treatment for suicide attempts and substance abuse five or six times, apparently following these attempts to take her life. Kinchen Dep. 19; Bolin Dep. 32-33.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56© provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith

9

Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

## DISCUSSION

Kinchen's complaint alleges that Wood should have been committed to CMC involuntarily for further evaluation on the night of May 9, 2002. Plaintiff avers that Defendants' failure to do so was negligent under Georgia law. Defendants assert several defenses to liability. First, Gateway argues that it is immune from suit as a state agency. Second, Bolin contends that he is entitled to official immunity as a state employee. Third, Bolin insists that he should be granted judgment as a matter of law because he lacked the authority to commit Wood of his own power and, therefore, was not the proximate cause of Wood's death.

Fourth, all Defendants maintain that they are entitled to summary judgment because Plaintiff has presented no expert evidence demonstrating that Defendants' conduct fell below the standard of care. Fifth, CMC denies responsibility for the negligence of Bolin or London because neither was an employee

10

AO 72A
(Rev. 8/82)

or agent of the hospital.  Sixth, Hurley urges that Kinchen has produced no evidence of negligence in her interactions with Wood.  Finally, CMC and Hurley posit that they are entitled to immunity because their acts were taken in good faith, in compliance with the admission and discharge provisions provided by Georgia law.

Because the Court finds that Bolin is entitled to official immunity, it will not consider his proximate cause argument. Because the Court finds that CMC cannot be liable for the actions of Bolin or London under any agency theory, it does not reach the hospital's argument that it is immune from suit under Georgia Code section 37-3-4, which provides immunity where certain hospital admission or discharge decisions are taken in good faith, in accordance with Georgia law.  Similarly, because summary judgment is otherwise proper, the Court will not decide whether Defendants are entitled to judgment as a matter of law because Kinchen failed to provide expert evidence of negligence.

11

I.   **Sovereign Immunity**

Under controlling precedent, the State of Georgia is immune from suit by citizens of Georgia, unless it has consented to be sued. Although it is not apparent upon the face of the Eleventh Amendment, the Supreme Court has interpreted it to mean that a citizen may not sue her own state in federal court absent consent.[2]   E.g., Seminole Tribe v. Fla., 517 U.S. 44, 54, 64-65, 69-70 (1996); Hans v. La., 134 U.S. 1, 13-21 (1890). Georgia has not waived its sovereign immunity in the federal courts generally. Ga. Code Ann. § 50-21-23(b) (2002).

Gateway is a community service board created under state law, and it qualifies as a "state agency." Ga. Code Ann. § 37-2-6 (2005 Supp.). In 1991, the Georgia constitution was amended to provide sovereign immunity to all state agencies, even if the entity carries liability insurance. Donaldson v. Dep't of Transp., 262 Ga. 49, 49-50 (1992); Satilla Cmty. Serv. Bd. v. Satilla Health Servs., Inc., 251 Ga. App. 881, 882

---

[2]
The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

AO 72A
(Rev. 8/82)

(2001). Consequently, Kinchen's suit against Gateway is barred by sovereign immunity.

## II. Official Immunity

In contrast to sovereign immunity, "official or qualified immunity offers limited protection from suit to governmental officers and employees." Gilbert v. Richardson, 264 Ga. 744, 750 (1994). In 1990, Georgia voters approved a constitutional amendment, which provided, in pertinent part, that:

> Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.

Ga. Const., Art. I, § II, ¶ IX(d) (1998).

The evaluation of a patient for possible suicidal tendencies, and the decision regarding whether to commit that person for involuntary treatment, quite clearly calls for an exercise of judgment. It is undisputed that Bolin's evaluation

13

of Wood was a discretionary, not a ministerial, undertaking. There is no evidence that Bolin acted with actual malice toward Wood.

Under the Georgia constitution's official immunity provision, Bolin is entitled to summary judgment.


## III.     Apparent or Ostensible Agency

CMC concedes that if a medical professional working at a hospital is negligent in the performance of his duties, the hospital may be held responsible.   However, the hospital contends that such liability rests upon an employer-employee relationship, and that it is not liable in this case because neither Bolin nor London was its employee.  E.g., Hosp. Auth. of Hall County v. Adams, 110 Ga. App. 848, 853 (1964).  Kinchen rejoins that even if Bolin and London were independent contractors in name, they were still the hospital's agents, or apparent agents.[3]

---

[3]
CMC faults Kinchen for failing to allege an ostensible agency relationship in her complaint, and argues that it is too late to assert such a basis for liability for the first time in her brief in opposition to Defendants' motion for summary judgment.  Nonetheless, Plaintiff's averment of an apparent agency relationship in her brief is permissible, because it is consistent with the allegations of her complaint.

A defendant who wants to pin the plaintiff down has to present evidence, at which point Rule 56(e) comes into play and the
(continued...)

14

The Second Restatement of Agency describes the circumstances whereby a principal may be held liable under the ostensible agency doctrine:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement (Second) of Agency § 267; see also Restatement (Second) of Torts § 429.

Contrary to CMC's representation, Georgia applies the principle of ostensible or apparent agency in determining whether hospitals are responsible for the medical professionals that provide care in their facilities. In such situations, Georgia courts have reasoned that: "[A]ppearances speak much louder than the words of whatever private contractual arrangements . . . may have [been] entered into, unbeknownst to the public in an attempt to insulate the hospital from

---

[3](...continued)
plaintiff can't rest on his pleadings, let alone on hypothesized facts intended to show that his complaint can be construed as stating a claim.

Of course a plaintiff can plead himself out of court. . . . If he alleges facts that show he isn't entitled to a judgment, he's out of luck.

Early v. Bankers Life & Cas. Co., 959 F.2d 75, 79 (7th Cir. 1992).

AO 72A
(Rev. 8/82)

liability[.]" <u>Brown v. Coastal Emergency Servs., Inc.</u>, 181 Ga. App. 893, 898 (1987).

To establish that a hospital is liable under the doctrine of apparent agency, the patient must demonstrate (1) that the hospital represented to the patient that the medical professional was its employee, and (2) that the patient justifiably relied on the skill of the professional. <u>Richmond County Hosp. Auth. v. Brown</u>, 257 Ga. 507, 510 (1987).

In this case, Wood cannot establish justifiable reliance. "In order for this estoppel to occur it must appear that the third party dealt with the agent on reliance upon the authority which the principal has apparently conferred upon him . . . ." <u>Interstate Fin. Corp. v. Appel</u>, 134 Ga. App. 407, 411 (1975).

Wood was taken to the emergency room by Officer Fear, in restraints. She did not seek out treatment at the hospital for any malady or emergency need of her own volition. Indeed, she repeatedly and vociferously denied having any medical problem requiring the assistance of one who exercises professional skill and judgment. Simply put, Wood did not rely on the professional skill of London or Bolin. Under these circumstances, the Court is constrained the conclude that CMC

16

may not be held liable for the acts or omissions of Bolin or London under the doctrine of ostensible agency.[4]

## IV.  Hurley's Purported Negligence

Kinchen has pointed to no basis on which Nurse Hurley may be held liable for negligence in caring for Wood.  Hurley's only interaction with Wood was when she performed a triage on the patient when Wood first arrived at the hospital.  The nurse testified that she had no further interactions with Wood, and Kinchen has not suggested how Hurley's conduct was negligent in any way.  Moreover, according to the expert report and affidavit of Donna Lee Bledsoe, a board-certified adult psychiatric registered nurse, Hurley's actions conformed to the standard of care.  Because there is no evidence of negligence by Hurley, she is entitled to summary judgment.

---

[4]
It bears mentioning that neither London nor Bolin qualify as CMC's "employee" under the multitude of factors set down in Cooper v. Binion, 266 Ga. App. 709, 710-13 (2004).  Most significantly, there is no evidence of control by the hospital over the conduct of London or Bolin.

17

**CONCLUSION**

For the reasons explained above, the motions for summary judgment are **GRANTED**.

**SO ORDERED**, this _____31_____ day of May, 2006.

_____

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

18

AO 72A
(Rev. 8/82)